UNITED STATES
BANKRUPTCY COURT
FILED

2006 JUL 10  PM 12: 07

C.L. AUSTIN, CLERK
MILWAUKEE, WISCONSIN

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF WISCONSIN

---

In re:                                              Chapter 7 Proceedings

ELIZABETH F. RILEY                                  Case No.  04-30807 JES

      Debtor.

---

GERALD A. BLOMBERG, JR.,
GERALD A. BURGER, and
ELI ENVIRONMENTAL CONTRACTORS, INC.,

      Plaintiffs,

      vs.                                            Adversary No.  04-2434

ELIZABETH F. RILEY,

      Defendant.

---

# DECISION

---

## INTRODUCTION

There is a bitter lesson to be learned from this adversary proceeding:

> **When a majority stockholder of a corporation lets
> personal and/or family interests interfere with and
> dictate the course of the corporation's business
> operations to the detriment of the minority
> stockholders, it spells "trouble – big, big trouble –
> with a capital 'T'."[1]**

---

[1] From "Ya Got Trouble," a song written for the musical "The Music Man," with music and lyrics by Meredith Willson (circa 1957).

That is precisely what happened here.

This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and (J).

## BACKGROUND

Elizabeth Riley ("Riley"), the debtor in this case, was the sole stockholder of Eli Environmental Contractors, Inc. ("Eli") when it was incorporated in November of 1993. Eli originally engaged primarily in the business of providing residential building underground fuel storage tank removal. It later expanded its operations to include building demolition.

On June 11, 2002, Gerald A. Blomberg Jr., ("Blomberg") and Gerald A. Burger ("Burger") each acquired 24.5% of the stock in Eli. This gave them collectively a 49% interest in the company, with Riley retaining a 51% majority interest. Burger and Blomberg each paid $50,000 for their shares of stock. Blomberg, who owns Midwest Rail & Dismantling Inc., a company which performs demolition work and which in the past worked with Eli as its subcontractor on some jobs, paid for his stock by contributing $50,000 worth of equipment. Burger paid $50,000 cash for his share of the stock. At the time of this stock purchase, Burger, Blomberg and Riley also entered into a shareholders' agreement. The shareholders' agreement, among other things, spelled out certain restrictions on Eli's future operations. These restrictions included the requirement of unanimous shareholder approval to:

1.  Hire any employee (other than laborers);

2.  Pay any sums exceeding $2,500; and

3.  Enter into any contracts in which the consideration exceeded $2,500.

2

Blomberg and Burger joined Riley as Eli's directors. Riley continued to serve as president, and the following parties became officers: Blomberg, vice president; Burger, treasurer; and Thomas Jacobson ("Jacobson"), who is Riley's son, secretary.

Riley, Blomberg and Burger also each signed separate contracts with Eli. The agreement between Eli and Riley was an employment agreement in which Riley was designated as chief executive officer. Her duties included overseeing the day-to-day operations of Eli, which duties she agreed to carry out solely for the benefit of Eli. Blomberg's consulting agreement required him to advise on demolition practices. Burger's consulting agreement required him to advise on insurance, construction bonding, finance and related matters. Jacobson also signed an agreement with Eli to serve as its general manager. He had been employed by Eli since 1999 starting as an equipment operator. When Blomberg and Burger acquired their respective stock interests, Jacobson became Eli's general manager. Jacobson was also the person who informed his mother that Blomberg and Burger were interested in purchasing stock in Eli and further told her that he thought it was a good idea. Under his employment agreement, Jacobson was required to devote all of his full-time efforts to the sole benefit of Eli. Jacobson's agreement also contained a 2-year non-competition agreement. Thomas Jacobson Jr., Andy Jacobson and Dan Jacobson, who are the sons of Jacobson and grandsons of Riley, were also on Eli's payroll when Blomberg and Burger became stockholders, and they continued to be employed by Eli thereafter.

### WHAT WENT WRONG?

Less than a year after Blomberg and Burger acquired their stock interests, a serious rift developed between Blomberg and Burger on one side and Riley and Jacobson on the other side. According to Blomberg and Burger, the major factors which contributed to this rift included various

3

actions taken by both Jacobson and Riley without their approval. These actions included the following:

1.   Jacobson signing collective bargaining agreements on behalf of Eli with Wisconsin Laborers' District Council 113 and with International Union of Operating Engineers Local 139 in October of 2002.

2.   Riley filing a bankruptcy petition under chapter 11 on behalf of Eli on August 19, 2003. This bankruptcy petition was subsequently dismissed by The Honorable Margaret Dee McGarity, United States Bankruptcy Judge for the Eastern District of Wisconsin, on September 15, 2003 because of a lack of proper corporate authorization.

3.   Eli entering into an agreement with Underground Power Corp. ("UPC"), which required Eli to pay all of the wages of UPC's employees in exchange for Eli's use of UPC equipment and UPC labor on Eli's jobs. (Tr. pp. 727, 948) Subsequently, UPC submitted an invoice to Eli for $175,000, which was challenged by Eli and was never paid.[2]

4.   Riley and Jacobson compromising a $130,000 account receivable due to Eli from Water Street Holdings, a company owned by Riley's brother, Thomas Short. Under the terms of this compromise, the amount of the account receivable was shaved to approximately $21,000 in cash plus a $50,000 note receivable. The compromise was finalized as part of a real estate closing held in February of 2003 in connection with the sale of certain real estate by Water Street Holdings to 435 Partners LLC. The $21,000 in cash paid to Eli came from the real estate sales proceeds together with a $50,000 note receivable from 435 Partners LLC to Eli. This note was not paid and ultimately resulted in litigation with a judgment in favor of Eli. This judgment remains unsatisfied. Short also paid Riley personally $20,000 in cash from the real estate sales proceeds. This payment to Riley was not disclosed by her to Blomberg and Burger.

5.   Riley diverting certain potentially profitable jobs obtained by Eli to various business entities owned or controlled by Jacobson and his three sons, who are also Riley's grandchildren. Riley explained this had to be done because Eli lacked sufficient personnel to perform and complete these jobs.

---

[2]   Eventually, this dispute wound up in Milwaukee County circuit court litigation and was settled between the parties by a nominal payment of $200 from UPC to Eli.

4

6.      Riley authorizing some of the Eli equipment to be used by Jacobson and his three sons for their separate business operations without any payment being received by Eli.

In response, Riley asserts that Blomberg and Burger knew of all or at least a portion of these actions and that some of these actions had been approved by them.

Other disputes between these parties widened the rift even further. Each side blamed the other for Eli's problems. Riley contended that Blomberg did not live up to his commitment to provide labor and materials. Blomberg vigorously contested these assertions. (Tr. p. 1048) Charges were also made against Blomberg that his company, Midwest Rail & Dismantling Inc., caused to be submitted an inflated bill for work performed by Eli as a subcontractor to Midwest and that Riley's signature on the pay request had been forged. Blomberg vehemently denied knowledge of these charges. (Tr. pp. 1060, 1062) Blomberg and Burger charged Riley and Jacobson with mismanagement and violations of their respective employment agreements with Eli. Riley's actions, (1) in attending an Eli shareholders' meeting the day before she filed the unauthorized chapter 11 petition in bankruptcy for Eli without disclosing to Burger and Blomberg her plans for this filing and (2) obtaining funds from Burger needed to pay Eli's creditors on the same day and shortly after she had filed this chapter 11 petition without informing either Burger or Blomberg that the petition had been filed, only increased the tension between the parties. A series of checks payable to Eli wound up in a bank account controlled by Jacobson. Why and how this happened was never satisfactorily explained during the trial. These payments arose out of the "Solvay Coke" job, which Eli was unable to perform. The Solvay Coke job was completed by Eli Companies LLC, a separate entity formed and owned by Jacobson.

5

In December of 2002, Blomberg first learned that Jacobson had signed two separate union contracts on behalf of Eli without first obtaining the permission of Blomberg and Burger. He then fired Jacobson. Jacobson, however, continued to work for Eli after this attempted firing and continued to receive payment for his services because Riley had not consented to Jacobson's firing. Finally, in March of 2003, Riley told Jacobson that he should accept the firing and he did so. He then left the employment of Eli at that time together with his three sons, who also terminated their employment with Eli.

Eli's business losses continued to mount. Blomberg and Burger each invested additional funds in Eli in an effort to keep the company afloat. Blomberg contributed at least $90,000 in cash, which has never been repaid. Burger contributed at least $52,500 in cash, of which he was repaid $15,000 from Eli, leaving an unpaid balance due to him of at least $37,500. In August of 2003, Eli, which had been leasing premises located at 304 Florida Street, Milwaukee, Wisconsin, was locked out of the premises by the landlord because of delinquency in rent payments. After this lock out, it was discovered that certain equipment of Eli was missing. Charges were made by Blomberg and Burger that some of the missing equipment was removed and retained by Riley and by Jacobson with Riley's approval. Riley and Jacobson both adamantly refuted these charges. (Tr. pp. 288-291 and 769)

In December, 2003, Riley resigned as president of Eli, leaving to Blomberg and Burger the task of winding down Eli's operations.

By mid-year of 2004, Eli stopped doing all business.

On July 22, 2004, Riley filed her individual petition in bankruptcy under chapter 7. Her bankruptcy petition, in turn, precipitated this adversary proceeding. In her bankruptcy schedules,

6

she listed as an asset a 51% stock interest which she owned in a corporation known as "TJ Environmental Contractors Inc." ("TJ"). Jacobson is the owner of the remaining 49% stock interest in TJ. Riley declared in her bankruptcy schedules that her stock interest had a zero value. At the time Riley filed her bankruptcy petition, TJ owned a 37.5 acre parcel of real estate located in Mequon, Wisconsin ("Mequon real estate"). Blomberg and Burger, in this adversary proceeding, assert that Riley intentionally failed to disclose in her bankruptcy schedules the existence of this real estate as well as the true value of her TJ stock interest, in order to shield the Mequon real estate from the reach of her creditors and the chapter 7 trustee. Blomberg and Burger have further contended that Riley's actions as director, officer, and majority stockholder of Eli damaged Eli's operations, resulting in their claim against her for fraud and breach of fiduciary duties, which claim should be declared nondischargeable.

### MEQUON REAL ESTATE

The Mequon real estate is located in the 8400 Block of West Highland Road, Mequon, Wisconsin. It was purchased by TJ in April of 1989 for $30,000 and is zoned for residential purposes. Land values in the Mequon area have since increased substantially in value, and the Mequon real estate involved in this case is no exception. On September 4, 2003, Jacobson obtained an appraisal on this land, which placed a $390,000 fair market value on this property. At the trial, Steven Launstein, a commercial real estate broker who was qualified by this court as an expert, testified that as of January 3, 2006 the Mequon real estate had a fair market value of $565,000.

In August of 1993, an involuntary petition in bankruptcy was filed against TJ in the Eastern District of Wisconsin, Case No. 93-24799. Subsequently, an order for relief was entered

under chapter 7 on September 22, 1993. All of TJ's assets, with the exception of the Mequon real estate, were liquidated. The trustee in the TJ bankruptcy case attempted to market and sell the Mequon real estate for $99,000. He was unable to sell the real estate and ultimately abandoned his interest in this land in February of 1995. After the trustee filed his final report in the TJ bankruptcy case and distributed dividends to the creditors, he was discharged, and the bankruptcy case was closed on September 15, 1997. Ever since the TJ bankruptcy case was closed, it has remained a defunct corporation holding the Mequon real estate as its only asset. TJ has never been formally dissolved.

After the TJ bankruptcy case was closed, the Mequon real estate was, on several occasions, utilized by both Riley and Jacobson as collateral solely for their respective personal loans. Some loans were obtained from Grafton Insurance Company ("Grafton Insurance"). Two of these loans were made in October of 1999 to Jacobson and his wife for $130,000 and $24,000. There was also a $100,000 loan made in November of 2001 by Grafton Insurance to Riley and Jacobson. The Mequon real estate also served as collateral for Riley and Jacobson in connection with a $20,000 loan which they obtained from Scott Burns and from which Riley received $5,000 and Jacobson $15,000. The Mequon real estate was also used as collateral for a $125,000 equipment loan made to Lake States Industrial Service Inc., a corporation owned and operated by Riley's grandchildren. None of these loans were made for the use or benefit of TJ.

In December of 2003, Grafton Insurance commenced a mortgage foreclosure suit against Jacobson and his wife and others arising out of a default in the $130,000 loan to Jacobson and his wife. Riley was not a defendant in this suit. Shortly before a sheriff's sale was to be scheduled, Jacobson approached Scott Blair ("Blair") who works for Heartland Wisconsin

8

Corporation and with whom Jacobson had a past business relationship, for the purpose of obtaining a loan. Jacobson informed Blair that: "I'm in trouble on this" (Tr. p. 158) and that funds were needed for him to pay off the loan to Grafton Insurance and avoid the forthcoming sheriff's sale. Blair responded that, while he was not interested in making the loan, he would be interested in purchasing this land. This led to a plan developed by Jacobson and Blair. It involved the formation of an entity which would be named "Heartland Corporate Estates" ("Heartland"), a limited liability company, and the sale of the Mequon real estate to this newly-formed entity. Under the terms of this plan, all outstanding liens and encumbrances against the Mequon real estate (including the mortgage held by Grafton Insurance) would be satisfied. Funding for this transaction would be provided by Heartland Wisconsin Corporation[3] which would then be given a new mortgage on this land. Under this plan, Blair and Thomas Jacobson Jr., who is Jacobson's son and the grandson of Riley, would be the sole members of the newly-formed entity.

This plan was subsequently revised. (Tr. p. 158) Jacobson Jr., instead of becoming a member of Heartland, would perform certain specified work on the land, consisting of tearing down the buildings, cleaning up, hauling off junk cars and snowmobiles, and removing hazardous waste materials. In return for these services, he would receive 75% of the profit from any resale of the land by Heartland. The remaining 25% of the profit would belong to Heartland. (Tr. pp. 123-124)

Blair testified that this agreement with Jacobson Jr. was made on the basis of an oral handshake agreement. (Tr. pp. 162-163) Blair's past relationship with Jacobson Jr. had been

---

[3]     Heartland Wisconsin Corporation is not the same entity as the newly-formed "Heartland Corporate Estates LLC."

minimal. It consisted of a single transaction in which Jacobson Jr. was a guarantor for an equipment lease obtained by his father from Heartland Wisconsin Corporation.

On April 15, 2005, less than one month after Heartland was formed, TJ sold the Mequon real estate to Heartland at a price of $246,121.61. This price was based upon the total of all outstanding liens, encumbrances, and closing costs. The sale was completed while Riley's bankruptcy was still pending and before Helen M. Ludwig, the chapter 7 trustee in Riley's bankruptcy, had either filed a report of no distribution or abandoned her interest in Riley's 51% stock interest in TJ. Trustee Ludwig also was not informed of this sale.

Three days after the sale, Heartland listed the Mequon real estate for resale with Re/Max, a real estate broker, at a listing price of $695,000. This listing price was subsequently reduced to $495,000.

In August of 2005, Jacobson Jr. approached Blair and told him that he needed funds immediately in order to pay off a personal debt. He offered to sell his 75% interest in the net profits from any resale of the Mequon real estate to Blair for $30,000. Blair accepted this proposal and provided Jacobson Jr. with a release, this time in writing. (Tr. pp. 163-165)

The current members of Heartland are Blair and Heartland Wisconsin Corporation.

On September, 14, 2005, Heartland received an offer to purchase the Mequon real estate from Dennis Bush for $410,000. Blair testified that this sale never took place because Attorney John Machulak, who is representing the plaintiffs in this adversary proceeding, notified the title insurance company of Riley's pending bankruptcy. This information caused the title company to decline to provide title insurance.

10

On October 7, 2005, Heartland received another offer to purchase the Mequon real estate, this time from Jeff Natrop for $430,000. This sale also was never consummated, and Heartland continues to own this land.

## ANALYSIS

After 4 days of trial and the receipt of more than 100 exhibits, the dust has begun to settle in this case. Still, a substantial amount of confusion remains as a result of charges, denials, and counter-charges asserted by the parties against each other.

A large part of this trial centered upon the cause of Eli's demise and raised a number of questions. Are Riley and her son, Jacobson, by their alleged actions in placing their family interests ahead of the interests of the stockholders, responsible? Was Blomberg under a duty to furnish Eli with adequate labor and equipment? If he was under such duty, did he fail to do so? Was Eli's collapse due to the inability of the parties to agree upon company policy decisions?

One thing is clear. When Eli expanded its operations by taking on demolition projects, it was unable to complete these projects because of insufficient labor and materials.

Regardless of who is responsible for the downfall of Eli, it is of no relevance with respect to the issues under § 727 of the Bankruptcy Code. What is relevant for purposes of § 727 is Riley's involvement with respect to the sale of the Mequon real estate to a third party and the charges asserted by the plaintiffs that she grossly undervalued her majority stock interest in TJ. Because a denial of discharge under § 727, if proven, would make moot any analysis of the alternative grounds asserted under § 523, the court shall initially focus its attention upon the alleged bases for denial of discharge under § 727.

11

The burden of proof for denial of discharge under § 727 is by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed. 2d 755 (1991). Because of the harsh consequences of denial of discharge under § 727, such objections are construed liberally in favor of debtors and strictly against creditors. In re Juzwiak, 89 F.3d 424 (7th Cir. 1996). However, a discharge in bankruptcy is a privilege, not a right, and should be afforded only to the honest but unfortunate debtor. Grogan v. Garner.

Although the plaintiffs have asserted grounds under § 727(a)(3) (failure to keep and preserve records) and § 727(a)(5) (failure to satisfactorily explain a loss of assets), the record in this case lacks support for either of these grounds. What is more to the point, however, are the grounds asserted under § 727(a)(2)(B) and § 727(a)(4)(A).

### SECTION 727(a)(2)(B)

The purpose of § 727(a)(2)(B) is to prevent a discharge of a debtor who attempts to avoid payment to his or her creditors by concealing or otherwise disposing of assets. Collier on Bankruptcy § 727.02(1) (15th ed. revised). Denial of discharge under this section requires the following:

1. Transfer or concealment of property,

2. Such property constituted property of the estate,

3. The transfer or concealment occurred after the filing of the bankruptcy petition, and

4. The transfer or concealment was made with the intent to defraud the bankruptcy trustee.

In re Chaplin, 179 B.R. 123 (Bankr. E.D. Wis. 1995).

12

Because TJ, and not Riley, is the owner of record of the Mequon real estate, it would appear on the surface that this mandates a finding that § 727(a)(2)(B) does not apply, since the Mequon real estate is not property of the bankruptcy estate. However, upon a closer analysis of the testimony and exhibits, the court must consider whether the alter ego theory should be invoked. If it is invoked, the court may then pierce the corporate veil of TJ and treat the Mequon real estate as Riley's individual property. The alter ego theory applies where it is shown that the corporate affairs have been conducted in such a manner that the corporation has no separate existence and is merely an instrumentality of the shareholders. Under such circumstances, the corporate form is being used to evade an obligation, gain an unjust advantage or commit an injustice. In re Miserendino, 2006 U.S. Dist. Lexis 29847 (E.D. Wis. 2006); Wiebke v. Richardson & Sons, Inc., 265 N.W.2d 571, 573, 83 Wis.2d 359, 363 (1978).

More precisely, what is involved in this case is the "reverse alter ego" theory. Judge Posner explained the reverse alter ego theory in Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995), by declaring, 56 F.3d at 758:

> Direct piercing of the corporate veil occurs when creditors of the corporation are trying to reach the shareholders; reverse piercing occurs when creditors of the shareholder are trying to reach the corporation.

Id. at 758. See also In re Skillen, 2004 Bankr. Lexis 389 (Bankr. N.D. Iowa 2004); In re Sklarin, 69 B.R. 949 (Bankr. S.D. Fla. 1987).

Although Riley is not TJ's only shareholder, she holds the majority stock interest. The record amply reflects that she, together with her son, Jacobson, who owns the remaining stock interest, have treated the Mequon real estate as their own property and not the property of TJ. Riley

13

and Jacobson each readily acknowledged in their testimony that, after the TJ bankruptcy case was closed, this real estate was utilized by them as collateral for their personal loans and not for the benefit of TJ. Riley stated that she gave her son "blanket authority to deal with the impending foreclosure in any way that he felt best" (Tr. pp. 42-43); however, that is no defense. Jacobson was acting by Riley's authority as was provided in a corporate resolution made on September 7, 2004. (Tr. p. 42) Sklarin contains similarities to the instant case. In Sklarin, the debtor controlled the transfer of corporate assets and his discharge was denied under § 727(a)(2). The court in the Sklarin case stated:

> It is well established that property of the debtor in the possession, custody and control of its alter ego comprises property of the estate at the commencement of the case, and that bankruptcy courts have the power to disregard separate corporate entities so as to reach the assets of its non-debtor alter ego to satisfy debts of the debtor.
> - - -
> When one legal entity is but an instrumentality or alter ego of another, by which it is dominated, a court may look beyond form to substance and may disregard the theory of distinct legal entities in determining ownership of assets in a bankruptcy proceeding.

Sklarin, 69 B.R. at 954 (citing In re F&C Services, Inc., 44 B.R. 863, 868 (Bankr. S.D. Fla. 1984)).

The court is satisfied that TJ's corporate veil should be pierced and that the Mequon real estate is property of Riley's bankruptcy estate. Consequently, the court finds that all required elements for a denial of discharge under § 727(a)(2)(B) are present. The Mequon real estate is treated as property of Riley's bankruptcy case under the alter ego doctrine. The bankruptcy petition was filed on July 22, 2004, and this property was sold on April 15, 2005, while the bankruptcy case was still pending. Riley's actions in not disclosing this property in her schedules and the transfer of the Mequon real estate to a third party by her son with her authority after she had filed for bankruptcy

14

were an attempt to insulate this property from her creditors and from the bankruptcy trustee. These actions also constituted a concealment and transfer made with the intent to defraud. Fraudulent intent exists where the debtor acts knowingly *or recklessly* (see In re Yonikus, 974 F.2d 901, 905 (7th Cir. 1992); In re Bostrom, 286 B.R. 352, 362-63 (Bankr. N.D. Ill. 2002)) and can be established by circumstantial evidence (see In re Abramov, 329 B.R. 125 (Bankr. E.D. N.Y. 2005)). In the present matter, Riley regularly treated the Mequon real estate as her own individual property (as evidenced by her use of the property as collateral for personal loans). Despite this treatment, she failed to disclose this property in her bankruptcy schedules or to the chapter 7 trustee. Riley's failure to make known the existence of this property, which she knew had significant personal value to her and which was sold during the course of her bankruptcy, constituted an intent to defraud the bankruptcy trustee.

Accordingly, all of the elements required for a denial of discharge under § 727(a)(2)(B) have been met.

## SECTION 727(a)(4)(A)

Section § 727(a)(4)(A) presents a separate basis for denial of Riley's discharge. Under this section, the plaintiffs must prove the following:

1.  Debtor made a statement under oath,

2.  Which was false,

3.  Debtor knew the statement was false,

4.  The statement was made with a fraudulent intent, and

5.  The statement related materially to the bankruptcy case.

In re Agnew, 818 F.2d 1284, 1289-90 (7th Cir. 1987).

15

The plaintiffs have easily established the first, second, and fifth elements under § 727(a)(4). Riley's statement in her bankruptcy petition and schedules was made under oath. A statement contained in a debtor's bankruptcy schedules qualifies as a statement under oath for purposes of § 727(a)(4). In re West, 328 B.R. 736, 749 (Bankr. S.D. Ohio 2004); In re Abramov, 329 B.R. at 132. Riley's statement listing the TJ stock as worthless when she filed her bankruptcy petition was false. This is borne out by the testimony presented and the exhibits received into evidence. The plaintiffs' appraiser, Mr. Launstein, testified that the value of the Mequon real estate as of January 3, 2006 was $565,000. Upon questioning, he stated that he would discount this value by 7.5% in order to arrive at the value of this land as of July 22, 2004, which was the date when Riley's bankruptcy petition was filed. Under this approach, the value of the Mequon real estate, as of July 22, 2004, would have been approximately $522,625. After deducting the outstanding liens and encumbrances which totaled $246,000, a substantial equity cushion still remained. This, in turn, directly affected the value of Riley's T.J. stock interest.

Because the court has seen fit to invoke the alter ego theory in its discussion of § 727(a)(2), Riley's omission of the Mequon real estate from her schedules also constituted a false oath. Omissions from bankruptcy schedules and statements of affairs constitute a false oath for purposes of § 727(a)(4)(A). In re Glenn, 335 B.R. 703 (Bankr. W.D. Mo. 2005); In re Bostrom, 286 B.R. 352, 360 (Bankr. N.D. Ill. 2002).

The false statements by Riley related materially to this case. Any matter having a bearing upon the discovery of estate property or the disposition of a debtor's property is material for purposes of § 727(a)(4). Abramov, 329 B.R. at 134 (Bankr. E.D. N.Y. 2005); In re Chalik, 748 F.2d 616, 618 (11th Cir. 1984).

16

What remains to be analyzed are the third and fourth elements under § 727(a)(4): did Riley know certain statements in her bankruptcy schedules were false and were such statements made with a fraudulent intent?

## KNOWLEDGE OF FALSE STATEMENTS

The court's conclusion that Riley knew when she filed her bankruptcy petition that her TJ stock had significant value is inescapable. Her pattern of having repeatedly utilized the Mequon real estate as collateral for herself as well as for Jacobson refutes any efforts on her part to persuade the court otherwise. Her attempts to distance herself from the transfer of this land from TJ to Heartland by claiming a lack of knowledge of what was happening is simply unbelievable. Riley is no novice. She is an experienced business woman. Although her son, Jacobson, attempted to corroborate her testimony by declaring that she had no knowledge of the sale of this real estate to the third party, he was not a credible witness, and his testimony in this regard is totally rejected. He acknowledged that he previously had filed his own bankruptcy petition in the Eastern District of Wisconsin in December of 1996 and did not even disclose in his schedules that he owned stock in TJ. When he was asked why he that was not done, his response was: "At that time, I believed I did not own the stock." Upon further questioning, however, he could not produce any documentation to support that explanation, and his response lacks merit.

Riley's testimony that she placed a zero value on her TJ stock after having consulted with Attorney John Kitzke, who informed her that the property was valueless, also is unavailing. Her explanation is merely self-serving. It is also significant that Attorney Kitzke did not testify on her behalf at this trial. In addition, Kitzke is an attorney, not an appraiser. If Riley, in fact, relied on what Kitzke told her in this regard, it would have been unreasonable for her to have done so, and

17

it was no defense where, as in this case, she knew that the Mequon real estate plainly had significant value. Any reasonable person would recognize that the listing of Riley's TJ stock interest at a zero value was baseless.

## FRAUDULENT INTENT

Fraudulent intent is difficult to prove because it is highly unlikely that a debtor will admit to fraud. Abramov. Nonetheless, fraudulent intent can be established by circumstantial evidence. In re Smiley, 864 F.2d 56, 566 (7th Cir. 1989). Moreover, a reckless disregard with respect to the truth can also satisfy the intent required in order to bar a discharge. Yonikus, 974 F.2d at 905; Bostrom, 286 B.R. at 362-63. In re Saylor, 339 B.R. 190 (Bankr. N.D. Ind. 2006), declared that actual knowledge that a statement is false and a conscious intent to deceive are not always required for purposes of § 727(a)(4). The court in Saylor stated that fraudulent intent also exists where the debtor has demonstrated "a reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy" regarding statements made under penalties of perjury. Id. at 191. Saylor also declared that "a debtor's reckless disregard for the truth of the information contained in its bankruptcy statements and schedules is sufficient to bar a discharge and may be regarded as the equivalent of actual fraud on the part of the debtor who submits false or inaccurate statements" Id. at 191 (citing Yonikus as authority).

Solely for the sake of argument, even if the alter ego theory is not applied, Riley's actions in knowingly and grossly undervaluing her TJ stock interest was inexcusable. A determination of fraudulent intent depends upon the court's evaluation of the demeanor and credibility of the witness. After having observed Riley, this court concludes she was not forthcoming in her testimony. At times, when pressed to respond to key questions, she would answer: "I do not

18

remember," "I do not recall," and "I do not know." On some occasions, she testified inconsistently. Her testimony with respect to her receipt of $20,000 obtained at the real estate closing held in February of 2003 involving the sale from Water Street Holdings to 435 Partners LLC is illustrative. At one point, she testified that it was a "complete windfall" and that she did not know why her brother gave her this money. (Tr. pp. 56 and 743) In another portion of her testimony, she said that her brother gave her this money because he felt it was the right thing to do since he had been living with Riley and with Jacobson and receiving meals over a period of three years. (Tr. p. 798) Still, upon further examination, it was brought out in her deposition that she stated that this money was received because of a loan made to her brother. (Tr. pp. 56, 797) These changing explanations have caused this court to be skeptical of her testimony. She also testified that, after she had filed her bankruptcy petition, she signed a TJ corporate resolution giving her son "blanket authority" in order to "deal with the impending foreclosure of the Mequon real estate in any way he saw fit." (Tr. pp. 794) She insisted that she did not know what happened to this property until it was first brought to her attention by her bankruptcy attorney. (Tr. p. 43) She testified that she had never informed the bankruptcy trustee about her signing the TJ corporate resolution because she "didn't realize it was necessary" and "didn't think there was any value to the property." (Tr. p. 44) That testimony by Riley is incredible.

The court concludes that all prerequisite elements under § 727(a)(4)(A) have been proven.

Case 04-02434-jes    Doc 50    Filed 07/10/06    Page 19 of 21

## **CONCLUSION**

Probably the most significant and troubling aspect of this entire case was that, only three days after the Mequon real estate had been sold by TJ to Heartland for $246,000, it was listed for resale at a price of $695,000 – a figure more than twice the amount of the purchase price paid by Heartland. Also very troubling and suspicious was the testimony presented that Riley's grandson, as part of this transaction, was to receive 75% of the profits from any resale by Heartland based upon an "oral handshake" agreement. This entire matter involving the disposition of the Mequon real estate during her bankruptcy and without Riley even notifying the trustee as to what was happening with respect to this property has a pungent odor to it. It leads the court to conclude that this was a scheme orchestrated to conceal the Mequon real estate from Riley's creditors and her bankruptcy trustee.

The court is persuaded that grounds for denial of discharge have been proven by a preponderance of the evidence under § 727(a)(2)(B) and § 727(a)(4)(A). It is, therefore, unnecessary to address the alternative grounds presented by the plaintiffs for exceptions to discharge under § 523.

The foregoing constitutes this court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

A copy of this decision is being referred to the Office of the United States Attorney for the Eastern District of Wisconsin for its review and determination as to whether criminal prosecution is warranted.

Dated at Milwaukee, Wisconsin, this 10th day of July 2006.

BY THE COURT:

James E. Shapiro

JAMES E. SHAPIRO
U.S. BANKRUPTCY JUDGE

c:
John E. Machulak, Esq.
1733 North Farwell Avenue
Milwaukee, WI 53202-1805

Rollie R. Hanson, Esq.
10150 West National Avenue, #370
West Allis, WI 53227-2152